# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DEWAYNE KNIGHT,

                Plaintiff,

v.

DR. THOMAS W. GROSSMAN,

                Defendant.

Case No. 16-CV-1644-JPS

**ORDER**

      Plaintiff, who is incarcerated at the Wisconsin Secure Program Facility, filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated. (Docket #1). This matter comes before the Court on Plaintiff's motion to proceed *in forma pauperis*. (Docket #2). Plaintiff has been assessed and has paid an initial partial filing fee of $1.40. 28 U.S.C. § 1915(b)(4).

      The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. *Id.* § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. *Id.* § 1915A(b).

      A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Gladney v. Pendelton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002). The Court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual

contentions are clearly baseless. *Neitzke*, 490 U.S. at 327; *Gladney*, 302 F.3d at 774. "Malicious," although sometimes treated as a synonym for "frivolous," "is more usefully construed as intended to harass." *Lindell v. McCallum*, 352 F.3d 1107, 1109 (7th Cir. 2003) (citations omitted); *accord Paul v. Marberry*, 658 F.3d 702, 705 (7th Cir. 2011).

To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts, and his statement need only "give the defendant fair notice of what the . . .claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see Christopher v. Buss*, 384 F.3d 879, 881 (7th Cir. 2004). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Christopher*, 384 F.3d at 881.

In considering whether a complaint states a claim, courts should follow the principles set forth in *Twombly* by first "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption

of truth." *Iqbal*, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. *Id.* If there are well-pleaded factual allegations, the Court must then "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Court is obliged to give the plaintiff's *pro se* allegations, "however inartfully pleaded," a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Plaintiff alleges that the relevant events occurred while he was a incarcerated at Waupun Correctional Institution ("WCI"). (Docket #1 at 5).[1] Defendant, Dr. Thomas Grossman ("Dr. Grossman"), is a private physician employed at Waupun Memorial Hospital (the "Hospital") as an orthopedic specialist. *Id.* at 6. The Wisconsin Department of Corrections ("DOC") contracts with the Hospital to provide medical services to its inmates. *Id.* It is on this basis that Plaintiff alleges that Dr. Grossman acted "as an agent of the Wisconsin Department of Corrections (WDOC) and under the color of state law." *Id.*

---

[1]The Court notes that Plaintiff filed an action nearly identical to this one in June 2015. *See Knight v. Grossman*, Case No. 15-cv-706-PP. That case was dismissed without prejudice in June 2016 on Plaintiff's oral motion. Notable here is the fact that the complaint in that case contained a great deal more detail than the instant complaint. Yet the Court is constrained to evaluate Plaintiff's claims on the basis of the factual allegations he presented in the instant complaint, not in some earlier, now-dismissed action.

Page 3 of 15

On January 25, 2013, Plaintiff saw Dr. Hennessy (one of the doctors in WCI's health unit), who made an initial diagnosis of a torn anterior cruciate ligament ("ACL") in Plaintiff's left knee, and referred Plaintiff to Dr. Grossman. *Id.* On February 14, 2013, WCI staff transported Plaintiff to the Hospital for a consultation with Dr. Grossman. *Id.* at 6–7. Dr. Grossman examined Plaintiff, and he and the Hospital's nursing staff performed a series of tests. *Id.* at 7. They did not conduct a magnetic resonance imaging ("MRI") test that day. *Id.*

Dr. Grossman diagnosed a torn ACL in Plaintiff's left knee and recommended ACL reconstructive surgery to relieve Plaintiff's pain. *Id.* Dr. Grossman described the procedure as an elective operation and was non-life-threatening. *Id.* Dr. Grossman offered two types of procedures: (1) an "autograft" procedure, which would use tissue from Plaintiff's right knee to rebuild the left knee; and (2) an "allograft" procedure, the nature of which Plaintiff does not explain in the complaint. *Id.* Plaintiff opted for and consented to the autograft procedure. *Id.* The DOC approved this procedure and surgery was scheduled for May 15, 2013. *Id.*

On May 15, 2013, WCI staff again transported Plaintiff to the Hospital. *Id.* At approximately 10:00 a.m., nurses prepared him for the autograft surgery. *Id.* He was then taken to the operation room, where Dr. Grossman met him and again asked for Plaintiff's verbal and written consent to the autograft procedure. *Id.* at 8. Plaintiff gave consent and was then placed under general anesthesia. *Id.*

While Plaintiff was under anesthesia, Dr. Grossman performed procedures other than the autograft procedure, including a chondraplasty

Page 4 of 15

Case 2:16-cv-01644-WED   Filed 01/17/17   Page 4 of 15   Document 7

and abrasion arthroplasty. *Id.* Plaintiff alleges that he did not consent to these procedures. *Id.* He further asserts that these two procedures were not performed in response to an imminent life-threatening condition. *Id.* Instead, Dr. Grossman undertook these procedures to treat some unspecified condition that he diagnosed during surgery and of which Plaintiff was previously unaware. *Id.*

Once Plaintiff awoke and learned that Dr. Grossman had not performed the autograft and performed the other two procedures instead, he demanded an explanation. *Id.* He was allegedly not provided one and was taken back to WCI. *Id.* According to Plaintiff, not until October 2013, at a follow-up visit with Dr. Grossman, did the doctor explain that when he opened Plaintiff's knee during surgery, he found the ACL fully intact. *Id.* at 9. As a result, Dr. Grossman concluded that there was no need to open the right knee. *Id.* Additionally, Dr. Grossman observed "significant patellofemoral joint degenerative disease," which led him to perform the chondroplasty and abrasion athroplasty. *Id.*

During this October 2013 visit, Dr. Grossman further explained that Plaintiff now needed a full left knee replacement due to arthritis. *Id.* However, he stated that Plaintiff could not receive it because he was too young and active and, as a result, a replacement knee would wear out quickly and the only remaining option would be amputation at the knee. *Id.* Plaintiff was "devastated" by the news, told Dr. Grossman that he "did not agree with what he'd done to him, the results, the prognosis, had no confidence in the diagnosis, and was highly upset." *Id.* Nothing more occurred during the visit. *Id.*

Plaintiff claims that since his surgery in May 2013, his condition "has worsened." *Id.* He suffers from "constant pain," takes multiple medications for pain, cannot play sports as he used to be able to, cannot put weight on his left knee for "long periods of time," and cannot do any "heavy lifting." *Id.* Plaintiff asserts that he has been "rendered disabled" and, according to Dr. Grossman, may have to have his left leg amputated from the knee down if he receives a knee replacement at his current age. *Id.*

Plaintiff alleges that Dr. Grossman failed to do the following: (1) properly diagnose his condition; (2) inform him of the mis-diagnosis once it was discovered; (3) inform him of the correct diagnosis once it was discovered; and (4) obtain Plaintiff's informed consent prior to the two other surgical procedures he performed, including informing Plaintiff of the risks associated with those procedures. *Id.* at 9–10. Plaintiff emphasizes that he was never given the opportunity to refuse these additional procedures. *Id.* Plaintiff claims that these failures—particularly Dr. Grossman's failure to obtain a "second" or "new" informed consent for the chondroplasty and abrasion arthroplasty—constituted a denial of his right to due process under the Fourteenth Amendment. *Id.* at 10–11. Raising these claims pursuant to 42 U.S.C. § 1983, Plaintiff seeks declaratory and injunctive relief in addition to compensatory and punitive damages. *Id.* at 12.

Plaintiff's allegations suffice at the screening stage to state several constitutional claims arising from Dr. Grossman's treatment of his knee. Initially, the Court notes that Dr. Grossman, although a private physician working at a private hospital, can be considered a "state actor" who may be liable for constitutional violations under Section 1983. *See Reynolds v. Jamison*,

488 F.3d 756, 764 (7th Cir. 2007) (plaintiff in Section 1983 action must show that the constitutional violation was committed by a person acting under the color of state law). Private physicians may be deemed state actors when they assume the State's duty to provide medical care to persons within its custody, such as prison inmates. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009); *West v. Atkins*, 487 U.S. 42, 54–57 (1988). To determine whether Dr. Grossman can be considered a state actor, the Court must look to the relationship between him and the State and whether the care was provided pursuant to an agreement to fulfill the State's "obligation to provide for the inmate's medical needs." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 672 (7th Cir. 2012). Where a private physician or hospital voluntarily agrees to treat inmates, the provision of such services may be considered state action. *Id.* at 673.

Here, DOC contracted with the Hospital to provide care to its inmates, and Dr. Grossman sought employment with the Hospital presumably knowing of this arrangement. Further, the care he provided to Plaintiff was provided voluntarily and not in an emergency situation. *Rodriguez*, 577 F.3d at 827–28. As such, Dr. Grossman can be said to have accepted part of the State's constitutional obligation to provide healthcare to inmates, and his care of Plaintiff can be considered state action. This conclusion is, of course, reliant on Plaintiff's factual allegations, which may be challenged later. But for screening purposes, the Court is obliged to conclude that Dr. Grossman was a state actor in this instance.

Having resolved that Dr. Grossman may be sued under Section 1983, the Court turns to the specific claims raised in this case. When a prisoner

Page 7 of 15

Case 2:16-cv-01644-WED   Filed 01/17/17   Page 7 of 15   Document 7

makes a due process claim, as Plaintiff has done, it is important to define with precision the nature of the claim being raised. This is because the Due Process Clause of the Fourteenth Amendment is the source of three separate constitutional protections. The Supreme Court has explained:

> First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e.g.*, freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government action 'regardless of the fairness of the procedures used to implement them.' *Daniels v. Williams*, 474 U.S. 327, 331 (1986). As to these two types of claims, the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. . . . The Due Process Clause also encompasses a third type of protection, a guarantee of fair procedure. A § 1983 action may be brought for a violation of procedural due process, but. . .[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*. . . . The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.

*Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original; citations and footnote omitted). In this case, Plaintiff gestures broadly at his "due process rights" without saying more. Construing his complaint generously, as the Court must, it finds that Plaintiff has stated claims for deliberate indifference to his serious medical needs, in violation of the Eighth Amendment, and deprivation of substantive due process, in violation of the Fourteenth Amendment.

First, Plaintiff's complaints about Dr. Grossman's misdiagnosis and failure to inform him of the misdiagnosis suffice to state a claim for deliberate indifference under the Eighth Amendment. To state a claim of deliberate indifference to serious medical need, the plaintiff must show: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle*, 429 U.S. at 105–06; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). It may turn out that Dr. Grossman's actions amounted, in whole or in part, to no more than negligence, but at the screening stage, the Court cannot say this with certainty. As a result, it will permit this claim to proceed.

Next, the Court finds that Plaintiff can proceed on a substantive due process claim against Dr. Grossman. To support a due process claim, a plaintiff must first identify a constitutionally cognizable liberty or property interest. *See Washington v. Glucksberg*, 521 U.S. 702, 720–22 (1997). The Supreme Court has recognized "a general liberty interest in refusing medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990); *Vitek*

*v. Jones*, 445 U.S. 480, 494 (1980); *Parham v. J.R.*, 442 U.S. 584, 600 (1979). This liberty interest includes, for instance, an interest in avoiding the unwanted administration of antipsychotic drugs. *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). More specifically, other Circuit courts have recognized a prisoner's limited right to have their physician obtain informed consent for treatment. *See Pabon v. Wright*, 459 F.3d 241, 249–50 (2d Cir. 2006); *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990); *Rainwater v. Alarcon*, 268 F. App'x 531, 534 (9th Cir. 2008). The Second Circuit's formulation of a cause of action based on that right is as follows:

> [T]he Fourteenth Amendment's recognized liberty interest in an individual's right to refuse medical treatment carries with it a concomitant right to such information as a reasonable patient would deem necessary to make an informed decision regarding medical treatment. To establish a violation of this right, a prisoner must show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment.

*Pabon*, 459 F.3d at 246. The Second Circuit cautioned, however, that the prisoner's right to refuse treatment—and by extension his right to informed consent—can be overridden by legitimate penological interests. *Id.* at 252 ("If prison officials, including doctors, identify situations in which they reasonably believe that treatment is required, notwithstanding the prisoner's asserted right to refuse it, the right must give way.").

The Seventh Circuit has noted but not endorsed this theory of liability. *See Cox v. Brubaker*, 558 F. App'x 677, 678–79 (7th Cir. 2014). Nevertheless,

given the low bar applied at the screening stage, the Court finds sufficient support in existing precedent to allow Plaintiff to proceed on an asserted liberty interest in refusing medical treatment, allegedly violated here by Dr. Grossman's failure to obtain Plaintiff's informed consent. *See Maple v. PA Mills*, Case No. 3:15–cv–00341–SMY, 2015 WL 1840563, at *4 (S.D. Ill. Apr. 21, 2015) (assuming, for screening purposes, that prisoner could assert informed-consent substantive due process claim). As with the Eighth Amendment claim, discovery may reveal that Dr. Grossman's actions constituted no more than negligence, which would defeat the claim. *See Pabon*, 459 F.3d at 250 ("The simple lack of due care does not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment."). At this early juncture, however, the Court cannot make that determination. As a result, the Court will permit a substantive due process claim to proceed on this basis.[2]

However, no procedural due process claim can be made on this ground. Procedural due process focuses on just that: procedure afforded a

---

[2]The Court further notes the important distinctions between the scope of the Eighth and Fourteenth Amendment claims at issue here. The Second Circuit explained those differences in *Pabon*, noting that the Eighth Amendment "governs the way in which medical treatment is administered to prisoners," while the Fourteenth "protects the individual's liberty interest in making the decisions that affect his health and bodily integrity." *Pabon*, 459 F.3d at 253. Thus, Plaintiff's claim that Dr. Grossman did not obtain his informed consent prior to performing the chondroplasty and abrasion arthroplasty must be assessed as a due process claim, while the other allegations, which pertain to Dr. Grossman's misdiagnosis of his knee conditions and failure to inform him of his revised diagnosis, are answered under the Eighth Amendment. It should be noted that the Seventh Circuit analyzed an informed-consent claim under the Eighth Amendment in *Phillips v. Wexford Health Sources, Inc.*, 522 F. App'x 364, 367 (7th Cir. 2013), but that opinion contains none of the analysis present in *Pabon* and, moreover, it predates *Cox*, which clearly places such a claim under the Fourteenth Amendment. *Cox*, 558 F. App'x at 678–79.

person before their liberty is curtailed. Where a state has established procedures that operate in such a way as to deprive individuals of their liberty without due process, Section 1983 will support a procedural due process claim. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36 (1982). By contrast, where there is a random, unauthorized deprivation of a protected liberty interest, whether negligently or intentionally done, it does not violate due process as long as the state furnishes an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981) *(rev'd on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986)), *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). In such circumstances, the "meaningful post-deprivation remedy" provided by state tort law is all the process that is due. *Parratt*, 451 U.S. at 544. The Supreme Court later explained in *Zinermon* that the key point of *Parratt* and *Hudson* is whether the deprivation of liberty was foreseeable by the state; if so, a procedural due process claim will lie. *See Zinermon*, 494 U.S. at 135–37.

Here, Plaintiff points to no established procedure he claims Dr. Grossman violated, nor do his allegations support any inference that DOC could have anticipated the doctor's actions. Instead, he simply wants to recover under Section 1983 for Dr. Grossman's allegedly unauthorized and tortious conduct in failing to obtain his informed consent. In other words, Plaintiff is not challenging DOC procedures; rather, he is "simply attempting to blame the State for misconduct" by Dr. Grossman. *Id.* at 136. As such, Wisconsin tort law, which provides a remedy for failure to obtain informed consent, is all the process due him under the Constitution. *See* Wis. Stat. § 448.30; *Hageny v. Bodensteiner*, 762 N.W.2d 452, 455 (Wis. Ct. App. 2008); *see*

Page 12 of 15

Case 2:16-cv-01644-WED   Filed 01/17/17   Page 12 of 15   Document 7

*also Wright v. Fred Hutchinson Cancer Res. Ctr.*, 269 F. Supp. 2d 1286, 1293 (W.D. Wash. 2002) (rejecting informed-consent procedural due process claim where Washington law provided tort cause of action for failure to obtain informed consent).

For the reasons stated above, the Court finds that Plaintiff may proceed on the following claims: (1) an Eighth Amendment claim that Defendant acted with deliberate indifference to his serious medical need in misdiagnosing Plaintiff's knee condition and failing to inform him of the misdiagnosis; and (2) a Fourteenth Amendment substantive due process claim arising from Defendant's failure to obtain his informed consent before performing the chondroplasty and abrasion arthroplasty.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to proceed *in forma pauperis* (Docket #2) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the United States Marshal shall serve a copy of the complaint and this order upon Defendant pursuant to Federal Rule of Civil Procedure 4. Plaintiff is advised that Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. § 1921(a). The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§ 0.114(a)(2), (a)(3). Although Congress requires the Court to order service by the U.S. Marshals Service precisely because *in forma pauperis* plaintiffs are indigent, it has not made any provision for these fees to be waived either by the Court or by the U.S. Marshals Service;

**IT IS FURTHER ORDERED** that Defendant shall file a responsive pleading to the complaint;

**IT IS FURTHER ORDERED** that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from Plaintiff's prison trust account the balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action;

**IT IS FURTHER ORDERED** that a copy of this order be sent to the warden of the institution where the inmate is confined; and

**IT IS FURTHER ORDERED** that, pursuant to the Prisoner E-Filing Program, Plaintiff shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is in effect at Dodge Correctional Institution, Green Bay Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility and, therefore, if Plaintiff is no longer incarcerated any of these institutions, he will be required to submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

Plaintiff is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2017.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge