# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEWAYNE KNIGHT,**

        **Plaintiff,**

    v.                                                 **Case No. 16-CV-1644**

**DR. THOMAS GROSSMAN, JR.,**

        **Defendant.**

## DECISION AND ORDER

Plaintiff DeWayne Knight is proceeding against defendant Dr. Thomas Grossman, Jr., on a claim that Dr. Grossman violated his Eighth and Fourteenth Amendment rights. Specifically, he claims that Dr. Grossman was deliberately indifferent to his serious medical need and violated his Fourteenth Amendment substantive due process rights by failing to get informed consent to perform a surgical procedure. The court recruited *pro bono* counsel to help Knight draft an amended complaint and then to represent him through discovery and summary judgment. Dr. Grossman has moved for summary judgment.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

1. *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

*2. Relevant Facts*

This section is taken from both Knight's responses to Dr. Grossman's proposed findings of fact and Dr. Grossman's responses to Knight's proposed findings of fact. (ECF Nos. 47 and 54.)

At all times relevant, Dr. Grossman was licensed to practice medicine as an orthopedic surgeon in the state of Wisconsin. (ECF No. 47, ¶ 1; ECF No. 54, ¶ 1.) He was employed by Agnesian Healthcare at the time he performed the surgery at issue in this case. (ECF No. 47, ¶ 2.) Agnesian, which ran Waupun Memorial Healthcare, and the Wisconsin Department of Corrections (DOC) had a contract to provide medical care to DOC inmates. (*Id.,* ¶¶ 94, 95, 106; ECF No. 54, ¶ 4.) Nearly 80 percent of Dr. Grossman's practice consisted of inmates of the DOC. (*Id.,* ¶ 4.)

The care of DOC inmate patients by outside consultant providers—like Dr. Grossman—is scheduled and approved by the inmate patient's DOC medical care provider. (ECF No. 47, ¶ 79.) Any medical "orders" Dr. Grossman issues in conjunction with his care of a DOC inmate patient are viewed as "recommendations" by the DOC, which might be implemented, ignored, or changed by an inmate patient's DOC medical provider at that provider's discretion. (*Id.,* ¶ 84.) Once an inmate patient is discharged and returned to the care of the DOC, the outside consultant has no further control over the care provided to that inmate patient. (*Id.,* ¶ 80.)

Knight saw Dr. Grossman for the first time on October 14, 2009, after injuring his knee playing basketball. (ECF No. 47, ¶ 6; ECF No. 54, ¶ 2.) After

3

examination, Dr. Grossman offered Knight an elective knee surgery to reconstruct his anterior cruciate ligament (ACL). (ECF No. 47, ¶¶ 6-7.) Dr. Grossman referred Knight back to his institution for surgery approval. (*Id.*, ¶ 10.) Knight did not see Dr. Grossman again until July 8, 2010, when his DOC care providers referred him back for follow up. (*Id.*, ¶ 11.) Dr. Grossman reviewed the previously taken MRI study and examined Knight; he again concluded that ACL surgery was appropriate. (*Id.*, ¶ 12; ECF No. 54, ¶ 5.) This time, Knight was approved for surgery, which took place at Waupun Memorial Hospital on July 26, 2010. (ECF No. 47, ¶¶ 14-15.)

Knight says he had no residual pain or other problems with his knee until 2012. (ECF No. 54, ¶¶ 6-7.) Knight saw Dr. Grossman again on February 14, 2013, after being referred by his DOC medical providers for complaints of unsteadiness and popping in the knee after coming "down in an awkward way" while playing basketball in August 2011. (ECF No. 47, ¶¶ 21-22.) After reinjuring his knee, Knight underwent some conservative treatment, including physical therapy. (*Id.*, ¶ 23.) When Knight saw Dr. Grossman in February 2013, Dr. Grossman ordered x-rays, performed a physical exam, and concluded that Knight had a torn ACL revision. (*Id.*, ¶¶ 24-25.) He did not order an MRI. (ECF No. 54, ¶ 8.) Dr. Grossman offered Knight an elective revision procedure. (ECF No. 47, ¶ 25.) Dr. Grossman discussed Knight's graft options—allograft versus autograft—and offered no promises or guarantees that it would completely resolve his complaints. (*Id.*, ¶ 27; *see also* ECF No. 54, ¶¶ 9-10.) In addition, Dr. Grossman offered his typical

4

preoperative patient discussion, which, although not verbatim, would have been something like the following:

> I think you have an ACL tear. Nothing needs to be done. If we don't do anything, you will not die, and your leg will not fall off. This will be the way that it is. If you'd like to, there is an elective operation. It has risks which are separate and distinct from that of the anesthetic. The risks include, but are not limited to, bleeding, infection, damage to nerves and blood vessels, scar, swelling, stiffness, inability to relieve your complaints and the need for further interventions. I am not going to offer any specific promises or make any guarantees. If you'd like me to do this, I would be very interested in doing it for you. I will do the best I can. I will take care of you for as long as you want me to, but that's it. Surgeons don't make any promises, and I don't promise myself lunch anymore.

(ECF No. 47, ¶ 28.)

When Knight told Dr. Grossman that he wanted to proceed with the surgery (the autograft procedure), Dr. Grossman referred him back to his institution for DOC approval. (ECF No. 47, ¶ 29; ECF No. 54, ¶ 11.) Knight returned to Dr. Grossman on May 13, 2013, for the surgery. (ECF No. 47, ¶ 30.) As of that date, Knight had degenerative disc disease (particularly, patellofemoral joint disease) in his left knee, which can cause pain, stiffness, "grinding," "crushing," "clicking," and "popping," as well as difficulty squatting and bending. (*Id.*, ¶¶ 31-34.) Patients might also experience anterior knee pain, quadriceps weakness, and knee instability. (*Id.*, ¶ 35.)

Before surgery, Knight signed a consent form in which he consented to the following:

> I hereby authorize Thomas Grossman, M.D. and whomever they might designate as their assistants, to perform upon myself, DeWayne Knight, the following procedures: Revision left anterior cruciate

5

reconstruction with donor site from right knee and to do such other diagnostic and therapeutic procedures as are in his/her and/or their professional judgment necessary and desirable. This includes but is not limited to procedures involving anesthesia, radiology and pathology. If any unforeseen conditions arise in the course of this procedure which in the professional judgment of the physician listed above requires procedures in addition to or different from those now contemplated, I further request and authorize them to do whatever is deemed necessary and advisable.

(ECF No. 47, ¶¶ 36, 38; *see also* ECF No. 54, ¶ 12.) The contemplated surgery, an ACL revision in the left knee, required both of Knight's knees to be opened surgically and healthy tissue harvested from his unaffected right knee implanted in his damaged left knee. (ECF No. 47, ¶ 40.)

Once Dr. Grossman started the surgery, he found that Knight's ACL was not, in fact, torn. (ECF No. 47, ¶ 42.) Rather, he found a "constellation of pathology" that included grade three changes in the trochlea, significant patellar osteophytosis, and dense stenosis on the lateral side on the intercondylar notch with a small bone fragment that were consistent with degenerative joint disease or arthritis. (*Id.,* ¶¶43-44; ECF No. 54, ¶ 13.) Dr. Grossman was aware that these findings would explain the symptoms of which Knight complained, including pain, clicking, and popping in the knee. (ECF No. 47, ¶ 45.) Knight's previous injury as a teenager made it more likely that he would experience degenerative joint changes. (*Id.,* ¶¶46-47.)

Dr. Grossman knew, based on his experience as an orthopedic surgeon, that the pathology he observed for the first time intraoperatively could be addressed through a series of arthroscopic surgical procedures, performed through the two

6

small incisions (approximately four to five millimeters in length) that were already in use. (ECF No. 47, ¶ 48.) He had to choose between attempting to address the observed pathology or closing the knee surgically and returning Knight to his institution, with the pathology unaddressed. (*Id.,* ¶ 52.) In deciding what to do, Dr. Grossman considered the fact that, because Knight was in DOC custody, Dr. Grossman could not control when or if Knight would again have access to surgery. (ECF No., 47 ¶ 53.) He decided to move forward, performing a chondroplasty of the trochlea, revision notchplasty, and abrasion arthroplasty of the patella. (*Id.,* ¶ 49; ECF No. 54, ¶ 14.) Dr. Grossman did not conduct a separate informed consent discussion or explanation of the procedures with Knight before doing so. (ECF No. 54, ¶ 19.) Dr. Grossman cleaned loose cartilage flaps and abraded the damaged surface. (*Id.,* ¶ 18.)

The parties dispute when Dr. Grossman made Knight aware that his ACL was intact and that he had found evidence of arthritis that he addressed during surgery. (ECF No. 47, ¶ 54.) Dr. Grossman contends that he told Knight after surgery that he had found no ACL tear but did find evidence of arthritis. (*Id.,* ¶ 56; *see also* ECF No. 54, ¶ 35.) Knight contends that he was provided with no details about the procedures Dr. Grossman performed until his post-op follow up appointment in August 2013. (ECF No. 54*,* ¶ 39.)

On August 13, 2013, the DOC returned Knight for a surgical follow up visit with Dr. Grossman's nurse practitioner. (ECF No. 47, ¶ 59.) It's unclear whether Knight saw Dr. Grossman during this visit. However, Knight was told (by whom the

7

parties do not say) that Dr. Grossman found an intact ACL but also found signs of patellofemoral joint degenerative disease. (*Id.*, ¶ 60.) The plan for Knight's further care was strengthening and physical therapy and to follow up in one month. (*Id.*, ¶¶ 61-62.) Knight, however, elected not to return to see Dr. Grossman. (*Id.*, ¶ 62.)

The parties agree that the diagnostic arthroscopy, the synovectomy (trimming of the synovium with a "sucker/shaver" device), and the debridement chondroplasty Dr. Grossman performed were reasonable under the circumstances and did not require additional informed consent. (ECF No. 47, ¶¶ 73-75.) However, Knight and his expert witness, Dr. Mark Hutchinson, contend that the abrasion arthroplasty was unreasonable and required an additional informed consent discussion. (*Id.*, ¶ 75.)

   3. *Analysis*

Upon screening of Knight's amended complaint the court allowed him to proceed with the following claims:

> Knight may proceed with a deliberate indifference claim against Grossman based on his allegations that he misdiagnosed Knight's injury, failed to inform Knight of the misdiagnosis, and unilaterally chose to perform procedures on Knight's knee without regard to the risks the procedures posed to Knight. Knight may also proceed on a substantive due process claim against Grossman based on his allegations that Grossman failed to obtain his informed consent before performing the procedures on his knee.

(ECF No. 25 at 5.)

   3.1 Deliberate Indifference to a Serious Medical Need

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates

8

"deliberate indifference to serious medical needs of prisoners." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016.) Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. *Id*. at 728. "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

The Court of Appeals for the Seventh Circuit has "consistently held that neither a difference of opinion among medical professionals nor even admitted medical malpractice is enough to establish deliberate indifference." *Zaya,* 836 F.3d at 805. "By definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment." *Id.* "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure

9

from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (internal quotation marks omitted).

Dr. Grossman does not dispute that Knight had a serious medical condition. Thus, the only issue is whether he was deliberately indifferent to that condition. Dr. Grossman argues that Knight cannot show that any of his actions amounted to deliberate indifference. Specifically, he argues that his treatment decisions were within professional standards, that his decisions are owed deference, and that a disagreement between professionals as to the appropriate treatment does not constitute deliberate indifference.

Knight does not offer evidence that Dr. Grossman misdiagnosed his injury. It appears he has abandoned that claim. It does *not* appear that Knight has abandoned his claim that Dr. Grossman's failure to inform him of the alleged misdiagnosis until months after the surgery fell below the applicable standard of care. However, he offers no evidence to support that claim. His expert witness, Dr. Hutchinson, does not so opine, nor does any other witness. Thus, Dr. Grossman is entitled to summary judgment on those claims.

That leaves Knight's claim that Dr. Grossman acted with deliberate indifference by performing a different surgery than that to which he consented. Knight's position is that, upon learning that Knight's ACL was not torn, Dr. Grossman should have stopped the surgery so that he could have a discussion with Knight about the risks associated with abrasion arthroplasty to address the

10

arthritis that Dr. Grossman discovered. Knight does *not* contend that, had Dr. Grossman had that discussion with him, he would have refused to consent to the abrasion arthroplasty. He argues only that he "may well have chosen" more conservative treatment options for arthritis. (ECF No. 45 at 25.)

Knight's expert witness, Dr. Hutchinson, opines only that the failure to obtain Knight's informed consent to perform the abrasion arthroplasty constituted "a departure from accepted medical standards." (ECF No. 44-1 at 1.) But "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far a field of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (internal citation omitted). Stated simply, the decision must "substantially depart from accepted medical practice." *Harper v. Santos*, 847 F.3d 923, 928 (7th Cir. 2017). Knight has presented no evidence that Dr. Grossman's decision to proceed with the abrasion arthroplasty without first getting Knight's consent substantially departed from accepted medical practice. *See Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 662-63 (7th Cir. 2016) (affirming district court's grant of summary judgment for the defendant when "no expert testified that [defendant's] chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony.").

Without evidence that Dr. Grossman's decision to perform the abrasion arthroplasty substantially departed from accepted medical standards, Knight has only shown that Dr. Hutchinson disagrees with Dr. Grossman's decision. That is not enough to create a genuine issue of material fact as to whether Dr. Grossman was deliberately indifferent to Knight's serious medical need. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (deliberate indifference claim requires more than disagreement with a doctor's medical judgment). And, as in *Whiting*, Dr. Grossman's decision to proceed with the surgery was not so obviously wrong that a layperson, without the benefit of expert testimony, could draw the required inference about Dr. Grossman's state of mind. Dr. Grossman states that he performed the abrasion arthroplasty to address the conditions he found during surgery, conditions that he concluded would explain the symptoms of which Knight was complaining. (ECF No. 37, ¶ 34.) In doing so, he considered a number of factors, including that Knight reported being in pain and that the degenerative joint disease could be addressed through a series of common procedures, each of which would be less invasive that the one (an ACL revision) that Knight had consented to. (*Id.*, ¶ 41.) Because Knight was in the custody of the DOC, Dr. Grossman had no control over when or if Knight would ever again have a chance to have the surgery that Dr. Grossman concluded he needed. (*Id.*)

In short, based on the record before this court, no reasonable jury could infer that Dr. Grossman's decision to proceed with the abrasion arthroplasty was made with the mental state necessary to show that he acted with deliberate indifference

to Knight's serious medical needs. This court offers no opinion as to whether Dr. Grossman's conduct constituted medical malpractice. Rather, the court concludes here only that it did not violate Knight's Eighth Amendment rights. As a result, Dr. Grossman is entitled to summary judgment on Knight's Eighth Amendment claim.

3.2 Due Process

The Court of Appeals for the Seventh Circuit has not explicitly endorsed a due process claim based on a lack of informed consent, although it has discussed such a claim. *See Phillips v. Wexford Health Sources, Inc.*, 522 Fed. Appx. 364, 367 (7th Cir. 2013), and *Cox v. Brubaker*, 558 Fed. Appx. 677, 678–79 (7th Cir. 2014). In *Phillips*, the Seventh Circuit affirmed the dismissal of a claim based on the alleged lack of informed consent of side effects from a particular drug, concluding that the plaintiff had not alleged that the risks of developing the side effects were substantial enough that a reasonable patient would be expected to be apprised of them. 522 Fed. Appx. at 367. *Cox* involved a claim for lack of informed consent regarding the side effects of the drug Pamelor. The Seventh Circuit stated that the facts of that case did not "require us to recognize, or decide the scope of, this due-process right because Cox supplies no evidence of the likelihood of Pamelor's side effects." *Cox*, 55 Fed. Appx. at 679. Thus, in neither case did the court decide whether to recognize a due process claim based on the lack of informed consent.

Dr. Grossman first argues that he is entitled to qualified immunity on Knight's due process claim. Contending that the Seventh Circuit has held that a private party may raise a defense of qualified immunity under certain

13

circumstances, he states that "Knight's case clearly falls within the class of cases in which qualified immunity may be raised by a private defendant." (ECF No. 35 at 24.) Knight responds that the Seventh Circuit "has repeatedly held physicians of private corporations that contract with the state to provide medical care for prisoners are not entitled to assert qualified immunity." (ECF No. 45 at 17.)

In *Richardson v. McKnight*, 521 U.S. 399 (1997), the Supreme Court held that employees of a private prison management firm are *not* entitled to invoke qualified immunity. In *Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012), the Supreme Court held that an attorney hired by a municipality to conduct its business of investigating a potential wrongdoing *was* entitled to invoke qualified immunity. However, *Filarsky* did not overrule *Richardson*. According to the Seventh Circuit, "the *Filarsky* Court reaffirmed the holding of *Richardson* categorically rejecting immunity for the private prison employees there." *Currie v. Chhabra*, 728 F.3d 626, 631 (7th Cir. 2013), citing *Filarsky*, 566 U.S. at 392-94. The Seventh Circuit has held in other post-*Filarsky* cases that private medical personnel in prisons are not afforded qualified immunity. See, e.g., *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017); *Rasho*, 856 F.3d at 479; *Petties,* 836 F.3d at 734. Thus, Dr. Grossman is not entitled to qualified immunity on Knight's due process claim.

Dr. Grossman next argues that Knight's due process claim must be dismissed because Knight consented in writing "to allow Dr. Grossman to take the actions that he did on May 15, 2013." (ECF No. 35 at 26.) Specifically, Dr. Grossman argues that the written consent form, authorizing him to perform whatever procedures which in

14

his professional judgment were necessary, desirable and advisable, authorized him to perform the abrasion arthroplasty.

Knight argues that the abrasion arthroplasty procedure was not necessary, desirable, or advisable. According to Knight, abrasion arthroplasty is a controversial and outdated procedure with benefits and risks completely different than an ACL reconstruction. (ECF No. 45 at 16.) According to Knight's expert witness, Dr. Hutchinson, an abrasion arthroplasty is an elective procedure. (ECF No. 48, ¶ 30.) Knight contends that Dr. Hutchinson opines that an abrasion arthroplasty was not necessary or required (ECF No. 45 at 16), although the proposed finding of fact that he cites does not support such a statement.

The parties dispute the nature of abrasion arthroplasty, the level of invasiveness, whether it is considered controversial and outdated, the risks it carries, and the rehabilitation it requires. (ECF No. 54. ¶¶ 21-25.) Knight has established that a genuine issue of material fact exists as to whether the consent form he signed authorized Dr. Grossman to perform the abrasion arthroplasty—that is, whether the procedure was necessary, desirable, or advisable. As such, the court cannot grant Dr. Grossman summary judgment on Knight's due process claim on the ground that the consent form authorized him to perform the abrasion arthroplasty.

Dr. Grossman next argues that Knight's due process claim fails "because it is unsupported by evidence sufficient to establish deliberate indifference." (ECF No. 35 at 28.) He acknowledges that, although the Seventh Circuit has not endorsed a

due process right to informed consent, other circuits have. For example, as outlined in this court's screening order, the Second Circuit has formulated such a cause of action that requires a prisoner to "show that (1) government officials failed to provide him with such information; (2) this failure caused him to undergo medical treatment that he would have refused had he been so informed; and (3) the officials' failure was undertaken with deliberate indifference to the prisoner's right to refuse medical treatment." *Pabon v. Wright*, 459 F.3d 241, 246 (2nd Cir. 2006). If a plaintiff can show nothing more than negligence, his claim will be defeated. *Id.* at 250 ("The simple lack of due care does not make out a violation of either the substantive or procedural aspects of the Due Process Clause of the Fourteenth Amendment."). Dr. Grossman argues that because Knight cannot establish deliberate indifference, his due process claim must be dismissed. (ECF No. 35 at 29).

In response, citing *Cox*, Knight argues that it is not clear whether the Seventh Circuit requires a finding of deliberate indifference under the Fourteenth Amendment. (ECF No. 45 at 15.) In any event, he argues that Dr. Grossman's actions *do* meet the standard for deliberate indifference. (ECF No. 45 at 15.)

In *Cox*, the Seventh Circuit expressly stated that it was not deciding whether to join those circuits that recognize as a matter of the substantive component of due process that prisoners have a right to such information as is reasonably necessary to make an informed decision to accept or reject proposed treatment. 558 Fed. Appx. at 679. Nonetheless, to the extent the Seventh Circuit would recognize such a right,

this court has no reason for concluding that it would use a different framework for showing a violation of that right than the framework used by the Second Circuit in *Pabon.* Applying that framework here, Knight's due process claim fails for two reasons. First, as discussed above, he has not submitted evidence establishing deliberate indifference. Second, he has not demonstrated that, had Dr. Grossman stopped the ACL surgery in order to discuss with Knight the abrasion arthroplasty risks and benefits, he (Knight) would have refused to proceed with the abrasion arthroplasty, all he says is that he *might have* refused. (ECF No. 45 at 25.) That is not enough.

Because Knight has not established that he would have refused to proceed with the abrasion arthroplasty had Dr. Grossman had a discussion with him about that surgery, and because Knight has not established that Dr. Grossman was deliberately indifferent in failing to have that discussion with him, he cannot sustain a claim that Dr. Grossman violated his due process rights. Thus, Dr. Grossman is entitled to summary judgment on this claim as well.

Finally, the court will deny as moot Dr. Grossman's motion to exclude Knight's expert's—Dr. Hutchinon's—causation testimony.

**IT IS THEREFORE ORDERED** that Dr. Grossman's motion for summary judgment (ECF No. 34) is **GRANTED** and this case is dismissed. The Clerk of Court shall enter judgment accordingly.

**IT IS ALSO ORDERED** that Dr. Grossman's motion to exclude the causation testimony of plaintiff's expert (ECF No. 40) is **DENIED AS MOOT**.

This order and the judgment to follow are final. A dissatisfied party may appeal this decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. I may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask the court to alter or amend the judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

Parties are expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 21st day of March, 2019.

*William E. Duffin*
WILLIAM E. DUFFIN
U.S. Magistrate Judge